**In the United States District Court**
**Middle District of Georgia**
**Macon Division**

| | |
|---|---|
| John F. Kennedy, solely in his capacity as Receiver for the Receivership Estate of Education Corporation of America, Virginia College, LLC, & New England College of Business And Finance, LLC, | Civil Action No. _____ <br><br> Related Civil Action No. 5:18-cv-00388-TES |
| Plaintiff, | **Complaint** |
| v. | |
| Avy Stein, an individual; Chris Boehm, an individual; and Stuart Reed, an individual. | |
| Defendants. | |

Plaintiff John F. Kennedy (the "Receiver"), solely in his capacity as Receiver for the Receivership Estate of Education Corporation of America, Virginia College, LLC, and New England College of Business and Finance, LLC (collectively, "ECA"), brings this complaint against ECA's former officers and directors Avy Stein, Chris Boehm, and Stuart Reed (collectively, "Defendants") for breaching their fiduciary duties of care, loyalty, and good faith owed to ECA and its stakeholders.

### Introduction

1.      This case is about how Defendants breached their fiduciary duties and intentionally caused ECA to incur potentially more than a hundred million dollars in liability by refusing to implement a teach-out that would have allowed ECA's students to complete their education when ECA closed. Defendants knew ECA's financial deterioration and regulatory challenges would result in ECA's closure but Defendants

still refused to implement or effectuate an orderly teach-out. Defendants did this purely in their own self-interests to reduce their investment firm's liabilities to ECA and to put their firm in a position to end up owning all of ECA's profitable schools. ECA ultimately abruptly closed without an orderly teach-out in place. And as a result of Defendants' schemes and refusal to implement a teach-out, ECA's 20,000 students were thrown out on the street with no way to complete their education and ECA was left with massive closed school loan discharge liability.

2.      ECA's business was to own and operate for-profit colleges and other training institutions across the nation. At its height, ECA's schools had over 70 campuses across the country including the well-known Virginia College and Brightwood schools.

3.      All three Defendants were directors of ECA. Stein was ECA's Chairman, Boehm was ECA's former CFO, and Reed was ECA's CEO. Stein co-founded Willis Stein & Partners, LLC ("Willis Stein"), a Chicago-based private equity firm, and Stein and Boehm were partners at Willis Stein, ECA's majority shareholder and one of its two secured creditors.

4.      By mid-2018, Defendants knew ECA was insolvent and that ECA would need to cease operations. Defendants also knew for years that ECA faced regulatory challenges that could put ECA out of business. The U.S. Department of Education ("ED") placed ECA on heightened cash monitoring status, which restricted and delayed ECA's receipt of federal Title IV funds that comprised nearly all of ECA's revenue. And

ECA's accreditor, the Accrediting Council for Independent Colleges and Schools ("ACICS"), required ECA to prove that it had not violated accrediting standards.

5.      Defendants also knew ECA needed to have an orderly teach-out in place in the event that ECA had to close and ECA's accreditor was demanding that ECA have teach-outs in place. ACICS and state regulators explicitly demanded that ECA submit plans to teach-out its students because of the possibility ECA would have to abruptly close.

6.      Defendants also knew that if ECA did not have an orderly teach-out in place in the event ECA closed, ECA could be liable for massive amounts of closed school loan discharges. Defendants were even advised by counsel that it would be a mistake and a significant risk to close without having an orderly teach-out in place. In addition, Defendants were advised that ECA and its directors and officers could be liable for more than a hundred million dollars in student loan discharges. Stein and Boehm were also advised that closing without an orderly teach-out was so risky that it was not an option that could be pursued. And Stein himself acknowledged that there could be continuing liability if ECA shut down in a way that left ECA students on the street with no option to complete their education.

7.      Even though Defendants knew ECA could be liable for closed school loan discharges if ECA closed without a teach-out in place, Defendants still chose to not implement or effectuate an orderly teach-out or have one in place in the event ECA had to close. Instead, Defendants chose to act in their self-interests and pursue their scheme

to put ECA into receivership so that Willis Stein could end up owning all of ECA's profitable schools.

8.      At the time ECA closed in December of 2018, ECA did not have sufficient teach-out options in place and its students were left with no ability to complete the education they signed up for. As a result, a significant number of ECA students filed for closed school loan discharges to have their federal loans forgiven. ED subsequently asserted claims against the Receivership Estate for over $40 million in closed-school loan discharges that it has granted former ECA students so far. And this number could increase to well over $100 million.

9.      ACICS then debarred Defendants Stein, Boehm, and Reed for their failure to teach-out ECA's students. The bar prevents Defendants "from being an owner, senior administrator, or governing board member of an ACICS-accredited institution" through 2024.

10.     Additionally, ECA's former students filed proofs of claims in the Receivership for damages they allegedly incurred for cost of tuition, unpaid stipends, and guaranteed refunds due to, among other things, ECA's closure without offering any teach-out options.

11.     To date, hundreds of millions of dollars in creditor claims have been filed in the Receivership, many of which could have been avoided had Defendants fulfilled their fiduciary duties.

## The Parties

### I.    Plaintiff

12.     Plaintiff John F. Kennedy is the Receiver for ECA.

13.     Mr. Kennedy was appointed Receiver by this Court (the "Receivership Court") on November 14, 2018 (the "Appointment Date").[1]

14.     Mr. Kennedy is a Georgia citizen.

### II.    Defendants

15.     Avy Howard Stein ("Stein") is the Chief Executive Officer and Managing Partner of Willis Stein and was principally responsible for directing and managing Willis Stein's investments, including its investment in ECA. On information and belief, Stein resides in Florida but maintains offices in Cook County, Illinois. At all relevant times, Stein served as Chairman of ECA's board of directors.

16.     Christopher Boehm ("Boehm") resides in Illinois and is a citizen of Illinois. Boehm served as a member of the ECA board of directors at the time of ECA's abrupt closure in December 2018. Boehm served as ECA's CFO from 2015 to June of 2018. Boehm was also a principal at Willis Stein and reported directly to Stein.

17.     Stuart C. Reed ("Reed") resides in Saint Petersburgh, Florida and is a citizen of Florida. Reed was ECA's CEO and a member of ECA's board of directors, and reported directly to Stein and Boehm.

---

[1] *See* Order Appointing Receiver and Preliminary Injunction, *VC Macon, LLC GA v. Virginia College, LLC, et al.*, Case No. 5:18-cv-00388 (M.D. Ga. Nov. 14, 2018) (Doc. 26) (the "Appointment Order").

**Jurisdiction and Venue**

18.     This Court has personal jurisdiction over each of the Defendants, as they have participated in the Receivership Proceeding before this Court.

19.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a). Federal district courts have original jurisdiction where the matter in controversy exceeds $75,000 and is between "citizens of different States."[2]

20.     The Plaintiff—the Receiver—is a Georgia citizen. "[T]he general common law rule [is] that courts will look to the citizenship of a trustee, *receiver*, administrator, or other representative, and not the party which he represents, in determining diversity jurisdiction."[3] Accordingly, only the Receiver's Georgia citizenship, and not the citizenship of ECA or any of its subsidiaries, is relevant for purposes of determining diversity jurisdiction.

21.     The Defendants, on the other hand, are citizens of Illinois and Florida.

22.     This action alleges more than $50 million in damages and therefore satisfies the $75,000 minimum jurisdictional threshold. Accordingly, this Court has jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332(a)(1).

---

[2] 28 U.S.C. § 1332(a)(1).

[3] *Clarkson Co., Ltd. v. Shaheen*, 544 F.2d 624, 628 (2d Cir. 1976) (emphasis added); *see also Gross v. Hougland*, 712 F.2d 1034, 1040 (6th Cir. 1983) (looking at receiver's citizenship for purposes of determining whether diversity existed instead of citizenship of entities over which receiver was appointed); *Hong Kong Deposit & Guar. Co. v. Hibdon*, 602 F. Supp. 1378, 1380 (S.D.N.Y. 1985) (same).

23.     In addition, or in the alternative, this Court has ancillary jurisdiction over this action based on the Appointment Order entered by the Receivership Court and under 28 U.S.C. §§ 754 and 1692.

24.     "When a receiver brings a recovery action in furtherance of his duties, therefore, the appointing court has ancillary subject matter jurisdiction over every such suit irrespective of diversity, amount in controversy or any other factor which would normally determine jurisdiction."[4]

25.     The Receiver was appointed by the Receivership Court to manage and control the property of the Receivership Estate, and the Appointment Order specifically vests the Receiver with the authority to assert actions such as this one.[5] The Appointment Order also gives the Receiver the right to pursue, for the benefit of the Receivership Estate, claims that could be asserted by ECA's creditors.[6]

26.     In relevant part, the Appointment Order states that the Receiver has the authority "[t]o assert any rights, claims, or choses in action of ECA […] that are Receivership Property or related thereto, to maintain in the Receiver's name or in the

---

[4] *Janvey v. Reeves-Stanford*, No. 3:09-CV-2151-N, 2010 WL 11463486, at *4 (N.D. Tex. Nov. 18, 2010); *see also Crawford v. Silette*, 608 F.3d 275, 278 (5th Cir. 2010) ("[I]t has long been an undisputed proposition that the initial suit which results in the appointment of the receiver is the primary action and that any suit which the receiver thereafter brings in the appointment court in order to execute such duties is ancillary to the main suit."); *Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010) ("The appointment of a receiver of a debtor's property by a federal court confers upon it, regardless of citizenship and of the amount in controversy, federal jurisdiction to decide all questions incident to the preservation, collection, and distribution of the assets. It may do this either in the original suit ... or by ancillary proceedings.") (quoting *Riehle v. Margolies*, 279 U.S. 218, 223 (1929)).

[5] (Doc. 26, pp. 4-5).

[6] (Doc. 26, p. 6).

name of ECA any action to enforce any right, claim, or chose in action, and to intervene in actions in which ECA is a party for the purpose of exercising the powers under this Order."[7]

27.      The Appointment Order further states that "all the business, business interests and property of [ECA, Virginia College and NECB], wherever located, by whomsoever held, without limitation… shall hereby be vested in a Receivership Estate."[8]

28.      Here, the Receiver brings this action on behalf of the Receivership Estate against Defendants based on the damages Defendants' breaches of fiduciary duty caused the Receivership Estate. This claim against the Defendants is an asset of the Receivership Estate.

29.      "A receiver has standing to bring ancillary recovery actions in the appointing court regardless of the jurisdiction in which property traceable to the entities in receivership may be found. This power flows from the plain language of 28 U.S.C. § 754."[9]

30.      28 U.S.C. § 754 states that:

A receiver appointed in any civil action or proceeding involving property, real, personal or mixed, situated in different districts shall, upon giving bond as required by the court, be vested with complete jurisdiction and control of all such property with the right to take possession thereof.

---

[7] (Doc. 26, p. 5).

[8] (Doc. 26, p. 4).

[9] *Reeves-Stanford*, 2010 WL 11463486, at *3.

He shall have capacity to sue in any district without ancillary appointment, and may be sued with respect thereto as provided in section 959 of this title.

Such receiver shall, within ten days after the entry of his order of appointment, file copies of the complaint and such order of appointment in the district court for each district in which property is located. The failure to file such copies in any district shall divest the receiver of jurisdiction and control over all such property in that district.

31.     In addition, 28 U.S.C. § 1629 states:

In proceedings in a district court where a receiver is appointed for property, real, personal, or mixed, situated in different districts, process may issue and be executed in any such district as if the property lay wholly within one district, but orders affecting the property shall be entered of record in each of such districts.

32.     As required by these statutes, the Receiver filed notice of the Appointment Order (and the underlying complaint) with all federal districts within the United States "within ten days after the entry of his order of appointment."[10]

33.     Accordingly, the Receiver was "vested with complete jurisdiction and control over" claims of the Receivership Estate, and this Court has jurisdiction to hear this matter.

---

[10] 28 U.S.C. § 754; *see example* Notice of Filing, *VC Macon, GA, LLC v. Virginia College, LLC et al.*, Case No. 18-mc-00750 (N.D. Ill. filed Nov. 16, 2018) (Doc. 1). On November 27, 2018, the Receiver filed his Notice of Compliance with the Receivership Court submitting that the Receiver had filed notices in every federal district court in the United States of America pursuant to 28 U.S.C. § 754. (*See* Doc. 35).

34.     Finally, venue is proper in this Court because property of the Receivership

Estate – including claims of the Receivership Estate – are under the control of the

Receivership Court.[11]

### Factual Background

35.     Plaintiff brings this case against Defendants for breaching their fiduciary

duties of care, loyalty, and good faith owed to ECA, its stakeholders, and its creditors.

Defendants' breaches, which led to ECA's demise and at least $40 million in liability to

ED for closed-school loan discharges, began by at least 2017 and continued at least until

the ECA's closure in December of 2018. Defendants' breaches also resulted in hundreds

of millions in claims brought by creditors.

36.     ECA's business was to own and operate for-profit colleges and other

training institutions across the nation. At the time ECA closed in 2018, it had

approximately 20,000 students and 71 campuses across the country including the well-

known Virginia College and Brightwood schools. All but one of ECA's institutions were

accredited by ACICS.

37.     At all relevant times, Willis Stein was ECA's majority shareholder and one

of its two secured creditors. As ECA's Chairman, Stein dominated ECA. He also used

his power at Willis Stein to effectively hand-pick ECA's board. In addition, the security

---

[11] *See Scholes v. Lehmann*, 56 F.3d 750, 753 (7th Cir. 1995) ("The laying of venue ... is authorized
by 28 U.S.C. § 754, which allows a receiver to sue in the district in which he was appointed to
enforce claims anywhere in the country."); *S.E.C. v. Bilzerian*, 378 F.3d 1100, 1107 (D.C. Cir. 2004)
(same); *Haile v. Henderson Nat. Bank*, 657 F.2d 816, 822 (6th Cir. 1981) (in receivership action
"where jurisdiction is ancillary, the post-jurisdictional consideration of venue is ancillary as
well.").

and profitability of Willis Stein's investment in ECA was a regular topic at ECA board meetings and in ECA's internal documents, even where it was irrelevant to ECA's business. While ECA's and Willis Stein's interests were partially aligned, the potential for Willis Stein's (and Defendants') financial interests to conflict with ECA's interests increased as ECA continued to move towards closure.

38.     Stein dominated ECA and its board and both Boehm and Reed were financially beholden to Stein. Among other things, Boehm's salary at Willis Stein was set directly by Stein. And even when working as ECA's CFO, Boehm reported directly to Stein and served Stein's agenda. In addition, Reed's employment and salary were controlled by ECA's board, which was effectively controlled by Stein. And Stein not only controlled Reed's compensation, but also the compensation of his wife, who was employed by Willis Stein as Stein's executive assistant from 2011-2018.

39.     Stein's influence at ECA meant that ECA's management and board often considered how ECA's business decisions would influence Willis Stein.

40.     A "teach-out plan" is a written plan developed by an institution that provides for the equitable treatment of students if an institution, or an institutional location that provides 100 percent of at least one program, creases to operate before all students have completed their program of study, and may include a teach-out agreement between institutions.

41.     A "teach-out agreement" is a written agreement between institutions that provides for the equitable treatment of students and reasonable opportunity for students to complete their program of study if an institution, or an institutional location

11

that provides for 100 percent of at least one program offered, ceases to operate or plans to cease operations before all enrolled students have completed their program of study.

42.    Accredited schools are required to arrange for the smooth transition for students in the event of the school's closure.

43.    A school can teach out its students by staying open long enough to graduate its existing students, securing agreements with other schools allowing students to transfer and complete their programs of study elsewhere, or a combination of the two.

44.    If a post-secondary school closes without teaching out its students, the closed school's students can apply to ED to discharge their federal student loans. If ED discharges the students' loans, ED can then seek to recoup the amount of such "closed school loan discharges" directly from the closed school.[12] But students who complete their program of study, or a comparable program, through a teach-out are ineligible for closed school loan discharges.[13] A school at risk of closing can protect itself from liability for closed school loan discharges by teaching out its students.

---

[12] Under federal law, if a student borrower "is unable to complete the program in which such student is enrolled due to the closure of the institution, . . . then [ED] shall discharge the borrower's liability on the loan (including interest and collection fees) by repaying the amount owed on the loan and shall subsequently pursue any claim available to such borrower against the institution." 20 U.S.C. § 1087(c). A student's Title IV loans are also automatically discharged if the student attended a school when it closed (or withdrew within 120 days of when it closed), and did not enroll at another school that participates in the federal student aid programs within three years of the date the school closed.

[13] 34 CFR § 685.214 (requiring students seeking discharge to submit sworn statement that student "[d]id not complete the program of study through a teach-out at another school").

I.   **Defendants knew for years that ECA's financial deterioration and regulatory challenges could cause ECA to close.**

   A.   **Defendants knew ECA's financial deterioration led to increasing regulatory sanctions that ECA might not be able to overcome**

45.     ECA's financial and regulatory problems began as early as 2014. In November 2014, ED reviewed ECA's 2013 audited financial statements, which produced a composite score of -0.8 out of 3.0. Based on these troubling results, ED determined that ECA failed to meet its financial responsibility standards, placed ECA on Heightened Cash Monitoring 1 ("HCM1"), and demanded a $27.8 million letter of credit.

46.     ED's decision to place ECA on HCM1 delayed ECA's receipt of federal funding revenue, which comprised nearly all of ECA's revenue. ED's requirement for ECA to post a letter of credit was meant to ensure that, if ECA abruptly closed, ED had funds to pay to teach out ECA's displaced students.

47.     In the spring of 2017, ECA submitted its fiscal year 2016 audited financial statements to ED. ECA's composite score was once again low and "in the zone," meaning that ECA remained on HCM1 for the third consecutive year.

48.     Because ECA was "in the zone," ED gave ECA two options to continue to participate in the federal funding programs. The first option was for ECA to provide a substantial letter of credit, in the amount of $210 million, to cover ECA's potential closed-school loan discharges in the event ECA abruptly shut down. The second option was called "the zone alternative." ECA chose "the zone alternative" where ECA

remained on HCM1 and had to report a substantial amount of information to ED on a continuous basis.

49.     By choosing "the zone alternative," ECA assumed an affirmative duty to report substantial information to ED. ECA was obligated to inform ED of any adverse restrictive actions by any accrediting agencies, violations of loan covenants, litigation regarding any credit or to collect any debt obligations, and any significant financing changes.

50.     By December 1, 2017, ED increased ECA's reporting requirements, requiring ECA to provide ECA's 13-week cash forecasts and other important financial information.

51.     In February 2018, ED required ECA to provide bi-weekly cash balances with the available cash on hand and monthly actual and projected cash flow statements with an explanation of variances. These reporting requirements reflected ED's recognition of ECA's perilous financial condition and the very real threat that ECA could be forced to cease operations.

52.     Nonetheless, Defendants failed to implement or effectuate an orderly teach-out, or to have teach-out or transfer agreements in place, to protect ECA's students and shield ECA from massive closed school loan discharge liability in the event ECA had to close.

**B.  Defendants knew ECA's distressed financial condition and failure to meet accreditation standards could cause ECA to lose its accreditation.**

53.     ECA relied on Title IV student loan funds for nearly all of its revenue. And in order to obtain Title IV funds, ECA had to be accredited by an accrediting agency recognized by ED. Therefore, if ECA was not accredited by a recognized accreditor, ECA could not obtain Title IV funds and could not survive.

54.     ECA was also under increasing pressure regarding its accreditation. ACICS was the accreditor for all but one of ECA's institutions. In December of 2016, ED withdrew ACICS' recognition. ECA therefore had to find a new accreditor within 18 months to retain (or otherwise lose) accreditation for its schools. Defendant Reed described this 18-month deadline as "an impossible timeline."

55.     Because ED withdrew its recognition of ACICS as an approved accreditor, ECA filed an application for accreditation with the Accrediting Council for Continuing Education and Training ("ACCET"). ACCET provided an initial accreditation deferred report on December 22, 2017 where ACCET identified numerous accreditation issues with ECA, including issues with institutional management, learning resources and management, and certification and licensing issues.

56.     ACCET reviewed Virginia College's and the Brightwood schools' accreditation applications, and conducted numerous campus visits as part of the review process. Following its review, ACCET denied the application for accreditation for Virginia College on May 1, 2018, and deferred action on the applications for the Brightwood schools. In the denial letter, ACCET noted that ECA had satisfactorily

15

addressed 20% of the "232 weaknesses identified across the institution's 33 campuses and the corporate office." However, this left "80% of the weaknesses originally cited substantially unresolved, spanning 23 of the 33 Standards of Accreditation." Additionally, 31 of the 33 campuses failed to meet the required completion and job placement benchmarks.

57.     In August 2018, ACCET's appeals panel unanimously voted to affirm ACCET's decision to deny the initial accreditation to Virginia College. This decision was based on violations of 19 accreditation standards, even after affording ECA an opportunity to submit additional information and documents to show compliance with the standards following ACCET's initial May 1, 2018 denial letter.

58.     In early 2018, ACICS had regained recognition from ED. But following ACICS's re-recognition, ACICS sent an institutional compliance warning to ECA regarding its institutions. By May 2018, ACICS sent a show-cause directive to Virginia College that required ECA to show cause why its accreditation should not be withdrawn due to material noncompliance with ACICS's placement rate standards. ACICS also directed Virginia College to show-cause why its current grant of accreditation with ACICS should not be withdrawn due to ACCET's denial of accreditation.

59.     By May of 2018, Defendants were placed on notice by both ACCET and ACICS that ECA's institutions were in not in compliance with numerous accreditation standards, and that ECA faced having its accreditation withdrawn. The risk of losing its accreditation posed an immediate threat to ECA's survival.

16

60.     But again, Defendants failed to implement or effectuate an orderly teach-out, or to have teach-out or transfer agreements in place, to protect ECA's students and shield ECA from massive closed school loan discharge liability in the event ECA had to close.

II.     **Defendants knew ECA could be liable for potentially more than a hundred million dollars if ECA closed without having an orderly teach-out in place.**

61.     Defendants discussed and were well aware of the massive liabilities ECA could incur if they failed to implement or effectuate an orderly teach-out of ECA's students. They were even advised by ECA's counsel of the potential liability ECA faced in closed school loan discharges if ECA closed without having an orderly teach-out in place.

62.     For example, in October 2018, Roger Swartzwelder, Executive Vice President, General Counsel, and Chief Compliance Officer forwarded Reed an email from ECA's outside counsel estimating that the liability that could result from ECA closing without teaching out its students "could approach $200 million." Swartzwelder explained to Reed in that email that everything possible had to be done to ensure that students have teach-outs. Reed then forwarded that email to Stein and others and explained that counsel concluded that closing without teaching out ECA's students posed "very significant risks."

63.     Swartzwelder also sent Stein a memorandum on October 2, 2018 informing Stein that closing ECA schools without teaching-out ECA's students exposed ECA to hundreds of millions in liability. Swartzwelder specifically advised that closing

one or more ECA schools without providing a proper teach-out or ensuring that students receive the education they signed up for, subjected ECA and its directors and officers to potentially "enormous financial liabilities, civil and criminal actions, career limitations, and other dire consequences." Swartzwelder advised that "ECA's loan discharge total likely would be in the $125,000,000-$150,000,000 range." And Swartzwelder advised that "Failure to close without providing teachouts would be a huge mistake and should not be contemplated."

64.     Around the same time, ECA's outside regulatory counsel also advised Stein and Reed that closing without a teach-out plan was "high risk or worse" and that "[t]his is not an option we should pursue." Stein respond to that email and said "I agree."

65.     Stein also admitted that there can be continuing liability to ECA "from a precipitous shut down that leaves students on the street…"

66.     But even though Defendants were aware of the enormous liability for closing ECA without teach-outs in place, Defendants still chose to not implement or effectuate an orderly teach-out, or to have teach-out or transfer agreements in place, to protect ECA's students and shield ECA from massive closed school loan discharge liability in the event ECA had to close.

III.    **ECA's accreditor ACICS demanded that ECA provide them with teach-out plans because ECA could close.**

67.     In September 2018, ACICS specifically demanded that ECA provide ACICS with an updated student audit for an institutional teach-out plan for ECA's

Virginia College. ACICS noted that it was "obligated to take adverse action against any institution that fail[ed] to come into compliance with the Accreditation Criteria within established time frames without good cause [. . . .]"

68.     Likewise, in October 2018, ACICS demanded that ECA's Brightwood schools submit an institutional teach-out plan.

## IV.   Defendants refused to comply with the Pennsylvania Department of Education's requests for teach-out plans.

69.     In May 2018, the Pennsylvania Department of Education directed ECA's Brightwood schools that if ACCET denied or deferred accreditation for Brightwood, which ACCET did, then "a teach-out plan must be submitted to the [Pennsylvania Department of Education] by June 30, 2018." But Defendants never complied with the division's request.

70.     Likewise, on November 2, 2018, the Pennsylvania Department of Education demanded that ECA's Pennsylvania-based schools submit a teach-out agreement for each active program. But again, Defendants never complied with the division's request.

## V.   Instead of implementing or effectuating a teach-out, Defendants devised a scheme to have Willis Stein become a secured creditor in ECA so that it could own ECA's profitable schools and reduce its liabilities to ECA.

71.     ECA (and Defendants) knew by mid-2018 that it was insolvent and could not survive in its current form, so it started to implement a restructuring plan. Under that plan, ECA was to close 26 campuses (the "sunset schools") that were no longer profitable over the course of two years. That would then leave a restructured ECA

19

consisting of only its remaining 45 profitable schools going-forward (the "go-forward" schools). But ECA's financial problems continued through the summer of 2018 and it became unclear whether ECA would be able to complete the restructuring plan.

72.     ECA's financial problems and the uncertainty concerning whether or not it would be able to complete its restructuring plan raised important negative implications for Defendants and Willis Stein. Willis Stein was ECA's largest stockholder, having invested in over $100 million worth of ECA stock. And Stein himself owned approximately three percent of Willis Stein's investment in ECA, which meant Stein personally had at least $3 million invested in ECA. Defendants knew that ECA's distressed financial condition could put Willis Stein's and Stein's individual investment in ECA's stock in jeopardy.

73.     Willis Stein also had ongoing contractual obligations to finance ECA that were directly implicated by ECA's poor financial condition. Specifically, ECA was a third-party beneficiary of a September 3, 2015 backstop agreement between Willis Stein and another ECA-investor, Monroe Capital ("Backstop Agreement"). Under the Backstop Agreement, Willis Stein was required to provide up to $20 million to ECA to satisfy certain regulatory obligations ECA might incur. And this obligation required Willis Stein to contribute up to $20 million in cash by purchasing ECA stock, and not by loaning money to ECA. Defendants recognized that ECA's financial condition could end up triggering Willis Stein's $20 million obligation under the Backstop Agreement, including if ED demanded that ECA post a letter of credit or if ECA closed without a teach-out and became liable to ED for closed school loan discharges.

74.     With potentially huge losses to Willis Stein's equity investment, including Stein's personal investment in ECA, and Willis Stein's potential $20 million liability to ECA under the Backstop Agreement in mind, Defendants acted in their self-interests and had ECA enter into contracts that would reduce Willis Stein's potential losses and liabilities to ECA. In fact, even though Willis Stein's obligation to ECA under the Backstop Agreement has already been triggered, Defendants and Willis Stein have formally aligned themselves in denying Willis Stein's liability to ECA under the Backstop Agreement. And Defendants have taken this position despite repeatedly acknowledging Willis Stein's liability to ECA under the Backstop Agreement while ECA was still a going concern. This is another example of Defendants' continued commitment to advance Willis Stein's interests and their own interests above ECA's.

**A.     Defendants negotiated for Willis Stein against ECA to become a secured creditor and reduce Willis Stein's liabilities to ECA under the Backstop Agreement.**

75.     Defendants negotiated and ultimately obtained a settlement agreement (the "Settlement Agreement") and Eighth Amendment to the Credit Agreement ("8th Amendment") with ECA on October 15, 2018. This permitted Willis Stein to extend ECA up to $20 million in secured loans that would reduce or eliminate Willis Stein's obligation under the Backstop Agreement to fund ECA's regulatory obligations. These agreements also arguably released ECA's claims against Monroe in relation to $8 million Monroe seized from an ECA-owned bank account, and facilitated an $8 million secured loan from Monroe to ECA. Under the Settlement Agreement, ECA also

21

purportedly disavowed its status and rights as a third-party beneficiary of the Backstop Agreement.

76.     The Settlement Agreement and 8th Amendment were not negotiated at arms-length. Stein and Boehm represented Willis Stein's interests against ECA and were involved in separate internal discussions with both sides (ECA and Willis Stein, and their respective outside counsel). Boehm even forwarded ECA's privileged communications with its outside counsel at DLA Piper to Willis Stein's outside counsel at Kirkland & Ellis. And Stein himself both signed these agreements on Willis Stein's behalf, and directly ordered ECA's general counsel to sign them for ECA. Stein and Boehm did these things knowing that ECA desperately needed money from Willis Stein, and that they could leverage ECA's desperation for Willis Stein's benefit. In doing so, Stein and Boehm placed Willis Stein's interests directly over the best interests of ECA.

77.     By leveraging ECA's need for money, Defendants were able to obtain several advantages for Willis Stein in the Settlement Agreement and the 8th Amendment to ECA's detriment. As just one example, Defendants substituted Willis Stein's $20 million obligation to fund (by purchasing ECA's stock) ECA's regulatory obligations under the Backstop Agreement for an obligation to loan ECA up to $20 million on a secured basis.

78.     This substitution benefitted Willis Stein and harmed ECA. Unlike Willis Stein's obligation under the Backstop Agreement, which required Willis Stein to provide cash for equity in ECA, Willis Stein's secured loan required ECA to pay interest

and to put its assets at risk (as collateral for the loan). Willis Stein also received a value

benefit through this substitution because, as secured debt, Willis Stein's loans to ECA

would be given the highest priority in a receivership or bankruptcy proceeding, and

could be used to purchase ECA's assets in a liquidation. This was a dramatic

improvement to Willis Stein's obligation under the Backstop Agreement, which would

have had the lowest priority and would not have been paid back if ECA filed for

receivership or bankruptcy.

79.     ECA's purported disavowal of its rights as a third-party beneficiary of the

Backstop Agreement in section 12(F) of the Settlement Agreement is another example of

a benefit Defendants obtained for Willis Stein at ECA's expense.[14] This section reads:

> ECA acknowledges and agrees that it is not party to or a third party
> beneficiary of the Backstop Agreement and, accordingly, has no rights to
> enforce any obligations of WSP under the Backstop Agreement.

But Defendants knew this was legally unsupportable. Indeed, ECA's outside counsel at

DLA Piper advised Defendants that ECA was a third-party beneficiary of the Backstop

Agreement, and that ECA had every right to enforce Willis Stein's obligations under the

that agreement. And in December 2018, Stein admitted to Boehm that Willis Stein's

lawyers advised (and Stein agreed) that Willis Stein was still liable to ECA under the

Backstop Agreement. Nevertheless, to this day Defendants and Willis Stein continue to

advance the admittedly false, and wholly self-serving, position that ECA is not a third

party beneficiary of the Backstop Agreement and cannot enforce Willis Stein's

---

[14] This provision of the Settlement Agreement, Section 12(F), is unenforceable against ECA as it
was improperly obtained in violation of law and public policy.

obligations under Backstop Agreement. Indeed, upon information and belief, Stein has the explicit and/or inherent authority to direct Willis Stein's actions with respect to the Backstop Agreement, and has directed Willis Stein to not only refuse to fulfill its obligations to ECA, but to deny that those obligations exist as well. Defendants' decision to attempt to negate ECA's status as a third-party beneficiary of the Backstop Agreement, which they knew was legally unsupportable and went against ECA's interests, showed their determination to use the Settlement Agreement to advance Willis Stein's and their own interests over ECA's interests.

80.     In order to convince Monroe to agree to the Settlement Agreement and the 8th Amendment (and to secure Willis Stein's benefits under those agreements), Defendants willingly sacrificed valuable rights ECA had against Monroe. Specifically, ECA had the right to recover $8 million that Monroe seized from an ECA bank account earlier in 2018. But Defendants forced ECA to release these rights under the Settlement Agreement and to instead accept an $8 million secured loan from Monroe. Unlike the $8 million Monroe was obligated to pay back to ECA (because Monroe seized it), Monroe's secured loan required ECA to pay interest and risk its collateral. And because it was secured debt, Monroe's loan to ECA gave Monroe the highest priority in a receivership or bankruptcy proceeding.

81.     Defendants also withheld material information from ECA's board of directors about the Settlement Agreement and the 8th Amendment. Defendants did not inform ECA's Board that they negotiated these agreements on behalf of both Willis Stein and ECA or how these contracts would benefit Willis Stein at ECA's expense.

Upon information and belief, Defendants did not even disclose the full versions of these agreements to ECA's board of directors, but instead provided ECA's board of directors with self-serving summaries that glossed over or completely omitted the terms of these agreements that were most beneficial to Willis Stein and harmful to ECA and its stakeholders.

**B.**     **After positioning Willis Stein to become a secured creditor, Defendants put ECA into a federal receivership so that Willis Stein could own ECA's 45 profitable schools clear of ECA's other debts.**

82.     After forcing ECA to agree to put Willis Stein into a position as a secured creditor, Defendants changed ECA's restructuring plan into a scheme in which Willis Stein would end up owning the 45 go-forward schools outright. Under this scheme, instead of restructuring ECA by closing the 26 sunset schools so that ECA could continue to operate with only the 45 go-forward schools, ECA sought the appointment of a federal receiver to resolve ECA's debts, and then sell the 45 go-forward schools to Willis Stein free and clear of ECA's preexisting debts (the "Receivership Plan").

83.     Defendants' Receivership Plan involved ECA suing ED and filing a motion to appoint a receiver in the United States District Court Northern District of Alabama. But through this proceeding, Defendants exposed ECA's distressed financial condition which caused serious concerns with ECA's regulators. Indeed, in the receivership filings, Defendants acknowledge through ECA that as of October 5, 2018, ECA had unsecured debt of approximately $47,000,000, owed to over 1,000 vendors and landlords, and secured debt of $19,000,000. ECA, "for months" had not been able to "timely service all of its financial obligations or timely meets its payables[,]" and was,

on average, "3 months past due in the payment of rent." And ECA had to admit that its "outstanding secured and unsecured obligations and lack of liquidity prohibit[ed] [ECA] from generally paying their obligations as they come due." Further, during the receivership hearing, ECA's attorneys had to admit that if the court didn't grant the requested receivership, ECA would not be able to pay its landlords or employees and would be forced to file Chapter 7 bankruptcy and liquidate all assets. And all of these statements proved ECA had been insolvent for months before Defendants' October 2018 attempt to have a receiver appointed.

84.     Defendants' intent in filing the Receivership Plan was to use the receivership to shed the sunset schools and their related debt from the go-forward schools, and then enable Willis Stein to purchase the go-forward schools out of the receivership free and clear of ECA's preexisting debt. And because Defendants had already negotiated the Settlement Agreement and 8th Amendment to convert Willis Stein's backstop obligation into a secured line of credit, Willis Stein wouldn't have to pay out cash to purchase the go-forward schools, but instead would purchase them by credit bidding the amount of its secured debt.

85.     This provided Willis Stein (and at least Defendant Stein) with a windfall as it would walk away with (and own) ECA's principal assets (the 45 go-forward schools), which had an estimated EBITDA growing from over $25 million in 2019 to over $42 million by 2021, with no debt burden. At the same time, the plan posed limited downside risk to Willis Stein, a secured creditor. And even if an outside entity happened to outbid Willis Stein's credit bid, Willis Stein's secured debt would be

repaid, which would ultimately leave it in a better position than if it was forced to purchase equity in ECA under the terms of the Backstop Agreement.

86.     The fact that Defendants were primarily concerned with Willis Stein's interests when they formed the Receivership Plan is evidenced by ECA's internal documents and communications, which contain detailed analyses of the plan's benefit to Willis Stein. Indeed, although Defendants called the Receivership Plan a "restructuring," it did nothing to restructure ECA. Instead, Defendants designed the Receivership Plan to fleece ECA by leaving it with unprofitable campuses (and their significant debts), while allowing Willis Stein to own, control, and profit from ECA's profitable schools (the 45 go-forward schools).

87.     Defendants also withheld material information from ECA's board of directors about their conflicts of interest in relation to, and the potential benefits Willis Stein would gain from, the Receivership Plan. And Defendants failed to disclose to the board of directors that if the Receivership Plan failed, ECA would likely face over $100 million in closed school loan discharge liability if ECA closed without an orderly teach-out for the 45 go-forward schools and their students.

88.     The Defendants' Receivership Plan incentivized them to preserve the value of the go-forward schools Willis Stein planned to walk away with. And Defendants' interest in preserving the value of the 45 go-forward schools ultimately led to their refusal to implement or effectuate an orderly teach-out for the 45 go-forward schools or their students.

89.     While implementing or effectuating an orderly teach-out for the 45 go-forward schools' students was in ECA's best interests because it would reduce or eliminate closed school loan discharge liability, it could have also significantly impaired the go-forward schools' value. Teaching out the go-forward schools could have meant ceasing enrollments at those schools and/or transferring and graduating existing students. And because the schools' revenue was tied to enrollments, these options would have adversely impacted the go-forward schools' value.

90.     Defendants acted in their own self-interest and against ECA's best interests by not implementing or effectuating an orderly teach-out for the 45 go-forward schools. Indeed, at least as early as the beginning of October 2018, Defendants considered and rejected a plan to teach out all of ECA's campuses and students in favor of Defendants' Receivership Plan. Defendants made this decision with full knowledge that failing to teach-out all of ECA's campuses and students could result in hundreds of millions in liability to ECA.

91.     At the very least, Defendants should have had a teach-out ready for all of ECA's campuses by mid-2018 that ECA could have been implemented or effectuated in the event ECA had to close. But Defendants refused to do so and instead acted in their own self-interests to create their Receivership Plan that they knew had little chance of success. And they did this because it provided a chance for Willis Stein to walk away with (and own outright) ECA's most valuable assets.

92.     In doing so, Defendants used their positions and influence to persuade other directors to approve their Receivership Plan, even though they knew it was

against ECA's best interests and designed to benefit Defendants' personal financial interests. Defendants also did not advise ECA's board of the inevitable liability that would result from closing without teaching out all of ECA's campuses.

93.     Defendants knew their Receivership Plan would almost certainly fail because of ECA's deteriorating financial condition, and that ECA would close if it did. The Receivership Plan was bound to cause complications from the start because it involved suing ED (the one entity responsible for nearly all of ECA's revenue that unquestionably had the power to put ECA out of business), while also admitting that ECA's financial situation was so dire that if the plan failed (and a receiver was not appointed), ECA would likely close. So it should have been clear to Defendants that ED would take action against ECA and the actions included placing ECA on HCM2 and requiring a letter of credit, when the Receivership Plan ultimately failed.

94.     And even though Defendants' failed Receivership Plan and ECA's insolvency triggered further scrutiny from ACICS, Defendants still failed to implement or effectuate an orderly teach-out, or to have teach-out or transfer agreements in place, to protect ECA's students and shield ECA from massive closed school loan discharge liability in the event ECA had to close.

**VI.     Even after ED placed ECA on additional heightened cash monitoring status, Defendants did not implement or effectuate a teach-out of ECA's students.**

95.     After the Receivership Plan failed, ED placed ECA on HCM2 on November 8, 2018 due to "ECA's current exigent financial condition." ED explained that its decision to place ECA on HCM2 was based on ECA's failed Receivership Plan

and its counsel's representation that "should the court not grant its request [to appoint a receiver], in addition to not being able to pay the landlords, ECA would not be able to pay its employees, would begin closing its locations, and would be forced to file Chapter 7 bankruptcy and therefore liquidate its assets."

96.     Like HCM1, HCM2 requires ECA to first disburse funds to students and then seek reimbursement from ED. But HCM2's reimbursement process is stricter and forces schools to "float" funds for much longer periods before being reimbursed. ED can place institutions on HCM2 for numerous reasons, including at ED's discretion, the institution's exigent finance conditions, and the institution's low composite scores. Defendants were aware that surviving on HCM2 was nearly impossible.

97.     In addition to putting ECA on HCM2, ED required that ECA post a substantial letter of credit. ED reviewed ECA's 2017 audited financial statements and determined that ECA failed to meet the financial responsibility standards because ECA had a 2017 composite score of 0.7 out of a possible 3.0.

98.     As a result of ECA's low composite score and  failure to meet ED's financial responsibility standards, ED presented ECA with two options to continue to participate in federal funding programs in November 2018: (1) post a letter of credit in the amount of $213,133,562, which represented 50% of ECA's most recently completed fiscal year federal funds revenue, or (2) accept a provisional certification alternative. With the provisional certificate, ECA would be required to post an irrevocable letter of credit in the amount of $63,940,069, while only being provisionally certified for a period of up to three years. Under both options, ECA would remain on HCM2.

99.     ED's determination that ECA had a low 2017 composite score, and that ECA was placed on HCM2 and required to post a substantial letter of credit could not have been surprising to Defendants. Defendants had been informed in August 2017 that if ECA had less than $11 million in GAAP EBIDTA, rendering ECA's 2017 composite score less than 1.0, that a letter of credit would be required in late 2018. Defendants knew, not only that its 2017 composite score would be low, but also that its 2018 composite score would be low too. And Defendants acknowledged that such low composite scores were one of ECA's "business risks."

100.    But even after ED placed ECA on HCM2, and despite knowing that ECA wouldn't be able to continue doing business, Defendants still made no attempt to implement or effectuate an orderly teach-out of ECA's students and did not have one in place that could be implemented or effectuated in the event ECA closed.

**VII.   Stein and Boehm also improperly negotiated against ECA's interests and prevented ECA from enforcing Willis Stein's funding obligation under the Backstop Agreement in further breach of their fiduciary duties.**

101.    In November and December 2018, Stein and Boehm caused Willis Stein to withhold critical funds they acknowledged Willis Stein owed ECA. At the time, Willis Stein owed $12 million. But rather than providing ECA the remaining $12 million, Willis Stein provided only $7 million and shorted ECA by $5 million.

102.    Stein and Boehm's emails show that they recognized Willis Stein owed the withheld $5 million. Indeed, Stein himself admitted in an email to Boehm and other Willis Stein investors "[w]e know we are on the hook for the 12" and predicted he would "clearly get sued" for the withheld $5 million. Stein further admitted that "the

likelihood that we will win the argument that we are not on the hook [for the $5 million] is low." Stein, Boehm, and Willis Stein also conspired to negotiate against ECA to obtain a "full release" of Willis Stein's additional $5 million obligation.

103.    Defendants also knew that ECA needed the $5 million to help teach out its students. Willis Stein's withholding of this $5 million during ECA's time of need directly contributed to ECA's abrupt closure and failure to teach out its students.

104.    In addition, Stein and Boehm put important limitations on the $7 million Willis Stein eventually provided to ECA. These limitations served Willis Stein's and Stein's and Boehm's interests. For example, nearly half of the $7 million was earmarked to purchase liability insurance to protect Stein and Boehm against future lawsuits that could result from their breaches of fiduciary duties.

105.    On November 18, 2018, Stein and Boehm were unequivocally informed that if Willis Stein's funding was not received by the end of the month, then ECA would "need to take action to cease operations the week of 12/3." Stein and Boehm were further asked "[w]hat are your critical path items to ensure that [the funding] is completed on time?" Stein and Boehm knew that ECA had been, and was, in a critical financial position, and they used that to benefit their personal interests and Willis Stein's interests ahead of ECA's.

## VIII.    Defendant Boehm grossly exaggerated ECA's projected EBITDA to conceal ECA's financial distress.

106.    During a May 2018 Board meeting, while Boehm was CFO and Executive VP of ECA, as well as a principal at Willis Stein, Boehm informed ECA's board that

ECA's second quarter reforecast EBITDA (earnings before interest, taxes and depreciation amortization) was $12.8 million.

107.    The information Boehm provided to the Board, however, was not accurate. Boehm stepped down as CFO during the summer of 2018, while remaining on ECA's Board as a director. Less than three months after Boehm projected ECA's EBITDA to be $12.8 million, ECA's new CFO, Michael Ranchino, realized ECA's actual financial condition was much worse and notified ECA's board that ECA's third quarter EBITDA was projected to be negative $9.3 million.

108.    In less than three months, according to financial information presented to the Board, ECA had experienced more than a $20 million negative EBIDTA swing. ECA's investors noted the dramatic swing occurred with "very little warning." By November, the Board was informed that ECA's condition had worsened further, and that ECA's fourth quarter forecast EBITDA was negative $40 million.

109.    Upon information and belief, Boehm's miscalculation was intentional and done with Stein's knowledge to improve the appearance of ECA's finances. This, in turn, would help ward off additional regulatory sanctions and allow time to implement Defendants' Receivership Plan.

## IX.    Defendants' breaches led to ECA's abrupt closure and potentially hundreds of millions in avoidable debts.

110.    On December 5, 2018, based on its deteriorating financial position, the Receiver decided there was no other choice but for ECA to announce that it would cease operations and wind down. Defendants and ECA's board of directors understood,

agreed with, and never questioned this decision. And although Defendants knew ECA

had to have a comprehensive teach-out in place that could be implemented or

effectuated on the day ECA closed, ECA had to close without a teach out that could be

implemented or effectuated and with no ability to provide teach-out options to over

90% of its students because of Defendants' wrongful acts.

111.    Defendants made a conscious decision to not implement or effectuate an

orderly teach-out even though they knew that could result in "up to $200M potential

liability" and that "the potential liability could dwarf the D&O coverage."

112.    And to date, over $500 million in creditor claims have been filed in ECA's

receivership. This is in addition to ED's claim for closed-school loan discharges, which

totals $42 million to date and is likely to increase substantially. Many of these liabilities

could have been avoided had Defendants fulfilled their fiduciary duties.

### First Claim for Relief
### Breach of Fiduciary Duties of Loyalty and Good Faith
### (Bad faith—Conscious Disregard of a Known Duty)

113.    Plaintiff realleges and incorporates by reference each of the previous

allegations.

114.    The fiduciary duty of loyalty "is not limited to cases involving a financial

or other cognizable fiduciary conflict of interest," but "also encompasses cases where

the fiduciary fails to act in good faith."[15] Fiduciaries breach their duties of loyalty and

good faith, for example, "where the fiduciary intentionally acts with a purpose other

---

[15] *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (quoting *Brehm v. Eisner (In re Walt Disney Derivative Litig.)*, 906 A.2d 27 (Del. 2006)).

than that of advancing the best interests of the corporation" or "where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."[16] Fiduciaries also breach their duties of loyalty and good faith through "abdication of their directorial duties" or by "any action that demonstrates a faithlessness or lack of true devotion to the interests of the corporation and its shareholders."[17]

115. The wrongful acts, omissions, and breaches of duty described in this Complaint were committed intentionally, in bad faith, and against ECA's best interests.

116. As a direct and proximate result of Defendants' wrongful acts, omissions and breaches of duty alleged in this Complaint, ECA and the creditors of ECA's Receivership Estate, have been damaged in an amount to be proven at trial, but not less than $50 million.

### Second Claim for Relief
### Breach of Fiduciary Duty of Care

117. Plaintiff realleges and incorporates by reference each of the previous allegations.

118. The duty of care requires that corporate fiduciaries "use that amount of care which ordinarily careful and prudent men would use in similar circumstances"

---

[16] *Id.* at 362.

[17] *Bridgeport Holdings Inc. Liquidating Trust v. Boyer*, 388 B.R. 548, 564 (Bankr. D. Del. 2008); *see also Alberts v. Tuft (In re Greater Se. Cmty. Hosp. Corp. I)*, 353 B.R. 324, 344 (Bankr. D.D.C. 2006) ("[M]aking a decision that is not in the corporation's best interests—abdicating one's directorial duties—is a breach of the fiduciary duty to act in good faith, . . . which is just another permutation of the fiduciary's duty of loyalty.").

and "consider all material information reasonably available in making business decisions."[18] A "good faith effort to be informed and exercise judgment is the core duty of care inquiry."[19] Lack of due care can also be shown through an irrational decision-making process.[20] Defendants were obligated to assess information regarding important corporate decisions with a "critical eye."[21]

119.    Defendants' fiduciary duties required that they be fully informed of ECA's financial condition and the consequences of their actions.

120.    ECA, through the Defendants, acknowledged that ECA was insolvent in the summer of 2018 at the latest, as ECA was unable to meet its maturing obligations as they became due in the ordinary course of business. Once ECA became insolvent, the "universe of people with standing to assert a beneficial interest in the fiduciaries' obligation to maximize the value of the corporation [. . . .]" expands to include the corporations' creditors.[22] As such, Defendants owed fiduciary duties to ECA's creditors when ECA became insolvent in the summer of 2018 (or earlier).

---

[18] *Boles v. Filipowski (In re Enivid, Inc.),* 345 B.R. 426, 450 (Bankr. Mass. 2006) (internal citations omitted).

[19] *Stanziale v. Nachtomi (In re Tower Air, Inc.),* 416 F.3d 229, 240 (3d Cir. 2005).

[20] *Id.* at 241.

[21] *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985).

[22] *In re Teleglobe Commc'ns Corp.,* 493 F.3d 345, 385 (3d Cir. 2007), <u>as amended</u> (Oct. 12, 2007) (*referencing Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.,* 906 A.2d 168, 205 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett,* 931 A.2d 438 (Del. 2007)); *Quadrant Structured Prod. Co., Ltd. v. Vertin,* 115 A.3d 535, 551–52 (Del. Ch. 2015).

121.    The wrongful acts, omissions and breaches of duty described in this Complaint were committed in bad faith, with gross negligence, and/or reckless disregard for ECA's best interests.

122.    As a direct and proximate result of the wrongful acts, omissions and breaches of duty alleged in this Complaint, ECA and the creditors of ECA's Receivership Estate, have been damaged in an amount to be proven at trial, but not less than $50 million.

### Third Claim for Relief
### Breach of Fiduciary Duties of Loyalty and Good Faith
### (Self-Dealing)

123.    Plaintiff realleges and incorporates by reference each of the previous allegations.

124.    The duty of loyalty "embodies not only an affirmative duty to protect the interests of the corporation, but also an obligation to refrain from conduct which would injure the corporation and its stockholders or deprive them of profit or advantage."[23] "[D]irectors must eschew any conflict between duty and self-interest.  They cannot succumb to influences which convert an otherwise valid business decision into a faithless act."[24]

125.    Defendants' acts and omissions of self-dealing described in this Complaint were committed in bad faith, with gross negligence, and/or reckless disregard for ECA's best interests. In each of these acts, Defendants acted in their capacities as ECA

---

[23] *Ivanhoe Partners v. Newmont Min. Corp.*, 535 A.2d 1334, 1345 (Del. 1987).

[24] *Id.*

directors and officers and knowingly acted against ECA's best interest in favor of their own personal interests.

126.    As a direct and proximate result of the wrongful acts, omissions and breaches of duty alleged in this Complaint, ECA and the creditors of ECA's Receivership Estate, have been damaged in an amount to be proven at trial, but not less than $50 million.

### Prayer for Relief

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against Defendants and in favor of the Receiver for the amount of damages sustained by ECA as a result of the Defendants' breaches of their fiduciary duties.

B.    Awarding the Receiver the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

C.    Granting such other and further relief as the Court deems just and proper.

Dated: March 31, 2021

By: _James F. Banter_

**JAMES-BATES-BRANNAN-GROOVER-LLP**
Jo Lanier Meeks
James F. Banter
Adam J. Wittenstein
231 Riverside Drive
Macon, GA 31201
Telephone: 478-742-4280
Fax: 478-742-8720

**Robins Kaplan LLP**
Ronald J. Schutz (*pro hac vice* to be submitted)
Michael A. Collyard (*pro hac vice* to be submitted)
Thomas F. Berndt (*pro hac vice* to be submitted)
Peter C. Ihrig (*pro hac vice* to be submitted)
Valerie A. Stacey (*pro hac vice* to be submitted)
800 LaSalle Ave.
Suite 2800
Minneapolis MN 55402
Phone: 612.349.8500
Fax: 612.339.4181

*Attorneys for Plaintiff*