# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| **JOHN F. KENNEDY, solely in his capacity as RECEIVER for the RECEIVERSHIP ESTATE OF EDUCATION CORPORATION OF AMERICA, VIRGINIA COLLEGE, LLC, & NEW ENGLAND COLLEGE OF BUSINESS AND FINANCE, LLC,** | |
| *Plaintiff,* | **CIVIL ACTION NO. 5:21-cv-00106-TES** |
| **v.** | |
| **AVY STEIN, an individual, CHRIS BOEHM, an individual, and STUART REED, an individual,** | |
| *Defendants.* | |

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS

On November 14, 2018, this Court appointed Plaintiff John F. Kennedy as the

Receiver of "all the business, business interest[,] and property of [Education

Corporation of America ("ECA")], wherever located, by whomsoever held, without

limitation" to be "vested in a Receivership Estate." Order Appointing Receiver and

Preliminary Injunction, *VC Macon, GA LLC v. Va. Coll. LLC*, No. 5:18-cv-00388-TES,

(M.D. Ga. Nov. 14, 2018), ECF No. 26, pp. 4, 15 (the "Appointment Order"). The Court,

via its Appointment Order, also gave the Receiver the authority "[t]o assert any rights,

claims, or choses in action of ECA . . . that are Receivership Property or related thereto,

to maintain in the Receiver's name or in the name of ECA any action to enforce any right, claim, or chose in action[.]" *Id.* at p. 5. Exercising this authority, the Receiver brings claims for: (1) breach of the fiduciary duties of loyalty and good faith, (2) a claim for breach of the fiduciary duty of care, and (3) a claim for self-dealing. After having assessed the Complaint [Doc. 1] filed against them, Defendants filed a Motion to Dismiss [Doc. 19] pursuant to Federal Rule of Civil Procedure 12(b)(6).

## FACTUAL BACKGROUND

The details of this case are dense and convoluted, and they span some time before the Court and the Receiver's involvement in the underlying Receivership Proceeding. Notice of Removal, *VC Macon*, No. 5:18-cv-00388-TES, (M.D. Ga. Oct. 18, 2018), ECF No. 1. That said, the cardinal rule for 12(b)(6)-based motions must be remembered: the Court *must* operate "on the assumption that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). With that in mind, let's unpack the Complaint's factual allegations.

ECA owned and operated for-profit colleges and other training institutions throughout the United States, and at the time of its closure in 2018, it enrolled approximately 20,000 students on 71 campuses across the country including Virginia College and the Brightwood schools. Defendant Avy Stein was ECA's Chairman, Defendant Christopher Boehm was its Chief Financial Officer, and Defendant Stuart C. Reed was its Chief Executive Officer. Stein co-founded Willis Stein & Partners, LLC

("Willis Stein"), a Chicago-based private equity firm, and he and Boehm were partners at Willis Stein, which is ECA's majority shareholder and one of its only two secured creditors. And, Stein personally owned approximately three percent of Willis Stein's investment in ECA, giving him a personal investment in ECA of at least $3 million.

As early as 2014, ECA's financial and regulatory challenges began to surface. After reviewing ECA's 2013 audited financial statements that revealed a composite score of -0.8 out of 3.0, the U.S. Department of Education ("DOE") placed ECA on heightened cash monitoring status, which restricted and delayed ECA's receipt of federal Title IV funds. As a result of ECA's placement on Heightened Cash Monitoring 1 ("HCM1"), DOE demanded a $27.8 million letter of credit that was meant to ensure available funds to teach out ECA's students should ECA abruptly close.

On September 3, 2015, as a result of a Backstop Agreement entered into between Willis Stein and another ECA investor, Monroe Capitol, Willis Stein was required to contribute up to $20 million in cash, not as a loan, but in the form of ECA stock. That $20 million would be used to satisfy any future regulatory obligations that ECA might incur. In 2017, ECA submitted its 2016 audited financial statements to DOE, which produced yet another low composite score and kept ECA on HCM1 for a third consecutive year.

At this point, DOE gave ECA two options in order to continue its participation in federal funding programs. The first option allowed ECA to provide a $210 million letter

of credit intended to cover ECA's potential closed-school loan discharges should it abruptly shut down. Understandably, ECA chose the second option: remain on HCM1 and report substantial amounts of information, including cash forecasts, to DOE on a continuous basis. Cash flow and distressed financial conditions aside, ECA also had to be accredited by an accrediting agency recognized by DOE in order to continue obtaining Title IV funds. Failure to secure accreditation from a DOE-recognized agency spelled financial doom for ECA because without the lifeblood of student loan funds, it could not survive.

In December 2016, DOE withdrew its recognition of the Accrediting Council for Independent Colleges and Schools ("ACICS") as an approved accreditor, which forced ECA to find a new accreditor within 18 months to retain (or otherwise lose) accreditation for its schools. ECA then filed an application for accreditation with the Accrediting Council for Continuing Education and Training ("ACCET"), and on December 22, 2017, ACCET provided an initial accreditation report identifying multiple institutional management issues, learning resources and management issues, and certification and licensing issues. After consideration of ECA's accreditation applications and campus visits, ACCET denied accreditation for Virginia College on May 1, 2018, but deferred action on the applications for the Brightwood schools.

In ACCET's denial letter regarding Virginia College, it noted that ECA had failed to resolve 80% of the "232 weaknesses identified across the institution's 33 campuses

4

and the corporate office." Despite having the opportunity—since May 2018—to submit additional information and documentation to show compliance with accreditation standards, ACCET's appeals panel unanimously voted to affirm accreditation denial to Virginia College in August 2018 based on violations of 19 accreditation standards.

However, in early 2018, ACICS had regained recognition from DOE, and it sent ECA an institutional compliance warning followed by two show-cause directives. The first directive asked ECA why ACICS shouldn't withdraw ECA's accreditation due to noncompliance with its standards, and the second asked why ACICS's current grant of accreditation to Virginia College shouldn't be withdrawn in light of ACCET's accreditation denial. Since the risk of losing accreditation posed an immediate threat to ECA's survival, ACICS and some state regulators required ECA to submit plans to "teach out" its current students. These plans provide for the equitable treatment of students if an institution ceases to operate before all students have completed their program of study.[1]

When an institution's closure is imminent, students who can complete their programs of study via teach-out plans are not eligible to have their student loan debt discharged by DOE. *See* 34 C.F.R. § 685.214. However, if a student "is unable to

---

[1] A closing institution can teach out its students by staying open long enough to graduate its existing students, it can develop teach-out plans that have written teach-out agreements between it and other schools that allow students to transfer and have a reasonable opportunity to complete their program of study, or it can use plans that involve some combination of those two options.

complete the program in which such student is enrolled due to the closure of [an] institution," the student can apply to have his or her federal student loan debt discharged, and DOE "shall discharge the [student's] liability on the loan (including interest and collection fees) by repaying the amount owed." *See* 20 U.S.C. § 1087(c). Then, once repaid, DOE recoups that amount directly from the closed institution.

In addition to ACICS requiring ECA to provide an updated student audit for an institutional teach-out plan for Virginia College and the Brightwood schools in September and October 2018, respectively, the Pennsylvania Department of Education had similarly instructed ECA that if ACCET denied or deferred accreditation for the Brightwood schools then ECA needed to submit its teach-out plans by June 30, 2018. ACCET (as mentioned above) did, in fact, defer accreditation to the Brightwood schools, but Defendants never complied with the Pennsylvania Department of Education's directive mandating a teach-out plan.

By mid-2018, ECA's financial problems made it clear that ECA could not survive in its current form. So, ECA started to implement a restructuring plan under which it would close 26 of its campuses that had not turned a profit since mid-2016. The "restructured ECA" would consist of 45 profitable campuses that were deemed the "go-forward" schools; however, ECA's financial struggles created a looming uncertainty for its largest stockholder, Willis Stein, as to whether ECA could fully complete its restructuring plan.

With no improvement to ECA's financial problems, the closure of the 45 go-forward schools became more likely, and Defendants' counsel cautioned them that it would be mistake and a significant risk to close ECA without teach-out plans in place. In October 2018, Roger Swartzwelder (ECA's Executive Vice President, General Counsel, and Chief Compliance Officer) sent Stein a memorandum informing him that closing ECA's schools with no teach-out plans exposed ECA to "enormous financial liabilities" to the tune of $125,000,000–$150,000,000; invited "civil and criminal actions[;] career limitations[;] and other dire consequences." Similarly, Swartzwelder forwarded Reed an email from ECA's outside counsel estimating that ECA's liability "could approach $200 million" if it closed without teaching out its students. All in all, counsel clearly advised that closing ECA without teach-out plans was an option that "should not be contemplated[]" or "pursue[d]." And yet, despite these and other warnings, Defendants failed to implement or effectuate teach-out plans in an effort to shield ECA from massive sums of DOE-discharged loan liability should ECA close its doors.

Not only could ECA's closure without teach-out plans bring about a potential $20 million liability for Willis Stein under its contractual obligations from the Backstop Agreement, but it could also spell a potentially huge loss to Willis Stein's enormous, $100 million equity investment (approximately three percent of which Stein personally owned). Rather than fulfill the obligations under the Backstop Agreement, Defendants had ECA enter into contracts that would reduce Willis Stein's losses.

Leveraging ECA's desperation for money for Willis Stein's benefit, Defendants—just before ECA's closure—negotiated with ECA and obtained a settlement agreement and an amendment to Willis Stein's credit obligations under the Backstop Agreement in October 2018. Stein signed both the settlement agreement and the amendment on Willis Stein's behalf, and he directly ordered ECA's general counsel to sign them for ECA. Defendants withheld full versions of these agreements and didn't divulge the details of how they were negotiated to ECA's board. Instead, Defendants provided self-serving summaries that glossed over and completely omitted the material terms of the agreements that directly benefitted Willis Stein to ECA's detriment.

These new agreements permitted Willis Stein to extend up to $20 million on a secured basis to reduce or eliminate Willis Stein's regulatory-induced obligations under the Backstop Agreement. By Defendants' account, these new agreements allowed them to substitute this $20 million secured loan in the place of Willis Stein's $20 million obligation to back ECA for its regulatory problems. Originally, the Backstop Agreement required Willis Stein to provide cash in equity for ECA by purchasing its stock, but the $20 million secured loan now required ECA to pay interest that would financially benefit Willis Stein.

Just as important, these new agreements effectively flipped the payback priority as a result of the secured loan. Under the Backstop Agreement, Willis Stein occupied the lowest payback priority possible—none at all—as it would not have been paid back if

ECA filed for bankruptcy or entered a receivership. But, after converting the $20 million from an equity stake into a secured debt, Willis Stein, with Defendants' help, vaulted itself from worst to first—it now held the highest payback priority in a bankruptcy or receivership proceeding.

Under the settlement agreement, ECA also purportedly disavowed its status and rights as a third-party beneficiary of the financial assistance from the Backstop Agreement. A section of the settlement agreement reads:

> ECA acknowledges and agrees that it is not party to or a third-party beneficiary of the Backstop Agreement and, accordingly, has no rights to enforce any obligations of [Willis Stein] under the Backstop Agreement.

Relying on it, Defendants continue to take the position that ECA is not a third-party beneficiary under the Backstop Agreement and is without recourse to make Willis Stein cover any regulatory obligations that ECA might incur. The Receiver, however, claims this section is unenforceable and that ECA retains its original right to force Willis Stein to satisfy its regulatory-based obligations under the Backstop Agreement.

After maneuvering Willis Stein into a dramatically improved position as a secured creditor, Defendants then eighty-sixed ECA's restructuring plan to sacrifice the non-profitable campuses so that the profitable campuses, or the "go-forward" schools, could continue to operate. Rather than continue as planned and teach-out the go-forward schools to potentially reduce hundreds of millions in liability to ECA for closed-school loan discharge liability, Defendants fashioned a new plan through which

they sought the appointment of a federal receiver to oversee and resolve ECA's debts. Under this plan, Willis Stein would purchase the go-forward schools free and clear of ECA's preexisting debts by credit bidding the amount of its secured debt.

However, through the receivership appointment, Defendants spotlighted ECA's distressed financial situation. ECA had not been able to service its financial obligations; meet its payables to its vendors; and was, on average, three months overdue in rent to its landlords. By and large, as of October 5, 2018, ECA had $47 million of unsecured debt and $19 million of secured debt. Purchasing ECA's principal assets—the go-forward schools—provided a profitable windfall to Willis Stein (mostly, Stein) because those schools had estimated earnings before interest, taxes, depreciation, and amortization of over $42 million by 2021 free of any burdening debt. This plan seemed to be a win-win for Willis Stein. Even if another entity managed to outbid Willis Stein's credit bid, Willis Stein would still be repaid because it still had its secured loan. Unlike the conditions through the equity purchase of the Backstop Agreement, the secured loan, obtained through the settlement agreement and amendment to Willis Stein's credit obligations, allowed it to recoup its money no matter who purchased the go-forward schools.

The Court's appointment of a receiver, however, could not salvage ECA from its deteriorating financial condition. When Defendants' alternate plan failed, DOE placed ECA on Heightened Cash Monitoring 2 (HCM2"). While HCM2, like HCM1, requires

ECA to distribute funds to its students first and then seek reimbursement from DOE, HCM2's reimbursement process is stricter, forcing schools to "float" funds for longer periods of time before being reimbursed. In addition to placement on HCM2 status, DOE, once again, required a substantial letter of credit because of ECA's 2017 composite score: 0.7 out of a possible 3.0. As a result of ECA's composite score and its failure to meet DOE's financial responsibility standards, DOE, in November 2018, gave ECA two options so that it could continue to participate in federal funding programs. Now, ECA could either post its letter of credit in the amount equal to 50% of ECA's most recently completed fiscal year federal funds revenue—$213,133,562. Or, ECA could accept a provisional certification alternative. This second option required ECA to post an irrevocable letter of credit in the amount of $63,940,069 and be provisionally certified for up to three years. Under either option, however, ECA would remain on HMC2.

With the Receivership Proceeding underway, little cash and no real option for a sudden cash infusion, the Receiver ultimately decided that ECA's deteriorating financial position with which he had been saddled left him with no real, viable option but to cease operations and wind down. So, ECA closed on December 5, 2018, without a single teach-out plan, thus exposing it and its officers and directors to potentially massive financial liabilities.

To put a finer point on it, ECA currently faces an increasing $42 million in liability for closed-school loan discharges from DOE and over half a billion—that's

*billion* with a "B"—dollars in creditor claims that have been filed in the Receivership

Proceeding. According to the allegations in the Complaint, many of these liabilities

could have been avoided had Defendants fulfilled their fiduciary duties.

## DISCUSSION

### A.    Legal Standard

A complaint survives a motion to dismiss only if it alleges sufficient factual

matter—accepted as true—that states a claim for relief that is plausible on its face.

*McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S.

662, 678–79 (2009)). In fact, a well-pled complaint "may proceed even if it strikes a

savvy judge that actual proof of those facts is improbable, and that a recovery is very

remote and unlikely." *Twombly*, 550 U.S. at 556 (citations omitted).

Although Federal Rule of Civil Procedure 8 does not require detailed factual

allegations, it does require "more than [ ] unadorned, the-defendant-unlawfully-

harmed-me accusation[s]." *McCullough*, 907 F.3d at 1333 (citation omitted). To decide

whether a complaint survives a motion to dismiss, district courts are instructed to use a

two-step framework. *Id.* The first step is to identify the allegations that are "no more

than mere conclusions." *Id.* (quoting *Iqbal*, 556 U.S. at 679). "Conclusory allegations are

not entitled to the assumption of truth." *Id.* (citation omitted). After disregarding the

conclusory allegations, the second step is to "assume any remaining factual allegations

are true and determine whether those factual allegations 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

Furthermore, a complaint attacked by a 12(b)(6) motion is subject to dismissal when it fails to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The Receiver "must plead more than labels and conclusions or a formulaic recitation of the elements of a cause of action." *McCullough*, 907 F.3d at 1333 (internal quotations omitted); *see also Twombly*, 550 U.S. at 555. "To be sure, [the Recevier] may use legal conclusions to structure his complaint, but legal conclusions 'must be supported by factual allegations.'" *McCullough*, 907 F.3d at 1333 (quoting *Iqbal*, 556 U.S. at 679). While courts, in ruling on a motion to dismiss, must take all of the factual allegations in the complaint as true; they are not bound to accept a legal conclusion couched as a factual allegation. *Iqbal*, 556 U.S. at 678. Courts must "identify conclusory allegations and then discard them—not 'on the ground that they are unrealistic or nonsensical' but because their conclusory nature 'disentitles them to the presumption of truth.'" *McCullough*, 907 F.3d at 1333 (quoting *Iqbal*, 556 U.S. at 681).

The focus of a Rule 12(b)(6) standard is not whether the Receiver will ultimately prevail, but "whether [he] is entitled to offer evidence to support [his] claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scheuer*, 468 U.S. 183 (1984). The factual allegations in a complaint "must be enough to raise a right to

relief above the speculative level" and cannot "merely create[] a suspicion of a legally cognizable right of action." *Twombly*, 550 U.S. at 545, 555. Finally, complaints that tender "'naked assertion[s]' devoid of 'further factual enhancement'" will not survive against a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (alteration in original). Stated differently, a complaint must allege enough facts "to raise a reasonable expectation that discovery will reveal evidence" supporting a claim. *Twombly*, 550 U.S. at 556. With the foregoing standard in mind and taking the above facts from the Receiver's Complaint as true, the Court rules on Defendants' Motion to Dismiss.

### B.   Defendants' Motion to Dismiss

In their Motion to Dismiss, Defendants enumerate six reasons why Plaintiff's Complaint should be dismissed. [Doc. 19, pp. 13–14]. First, they say the Receiver's Complaint is an impermissible shotgun pleading that violates federal court pleading standards. [*Id.* at pp. 14–15]. Their second reason is based on normal failure-to-state-a-claim grounds for the Receiver's claims for breaches of the duties of loyalty and care. [*Id.* at pp. 15–22, 26–30]. In their third and fourth reasons, Defendants blame the Receiver for "all actions taken or not taken on behalf of ECA" since his appointment, arguing that he is now judicially estopped from bringing claims to related to ECA's loans. [*Id.* at pp. 22–26]. Finally, Defendants' fifth reason sounds the business judgment defense, and their sixth reason points back to the Receiver—this time though, arguing

that he doesn't have standing to assert claims on behalf of ECA's creditors. [*Id.* at pp. 27–31].

> ### 1.     Defendants Argue that the Receiver's Complaint is an Impermissible Shotgun Pleading

While the Complaint may repeat itself at times, this often-lobbed, run-of-the-mill argument made by most defendants simply just isn't applicable in this case. When the events from the Complaint are placed in some semblance of chronological order, they are "set forth . . . in sufficiently comprehensible fashion" for Defendants and the Court to "understand and address them." *Isaac v. United States*, 809 F. App'x 595, 598 (11th Cir. 2020). To show just how comprehensible the Receiver's claims are, the Court easily lifted the Complaint's factual allegations and narratively authored its Factual Background to detail each Defendants' role in this case and how their actions allegedly had an impact on ECA. Frankly, that's all a complaint must do—it must "give . . . [D]efendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* at 599.

The Court quickly notes that the Complaint in this case deals with only three defendants, not 50 who, like in *Isaac*, had the near impossible task of unraveling Isaac's pleading to guess against whom Isaac tacked 13 unspecified counts. *Id.* That clearly isn't the case here. Moreover, Defendants' detailed and well-written briefs in support of their dismissal motion clearly belie any contention that they can't figure out why they're

being sued.[2] Defendants' Motion to Dismiss based on an argument that the Receiver's Complaint is an impermissible shotgun pleading is **DENIED**.

### 2. Defendants Argue that the Receiver Fails to State a Claim for Breaches of the Duties of Loyalty and Care

In the Complaint, the Receiver alleges that Defendants consciously disregarded their fiduciary duties of loyalty and care to ECA. With respect to the law governing these claims, Defendants argue that Delaware law applies, and the Receiver ostensibly agrees with Defendants' choice-of-law position given that he also relies on Delaware law in his opposing arguments. [Doc. 19, p. 14 n.4].

One of the avenues by which the Court has jurisdiction in this case is through diversity jurisdiction. 28 U.S.C. § 1332; [Doc. 1, ¶¶ 12, 14, 15–17, 19]. Therefore, in this diversity action, the Court is *Erie*-bound to apply its forum state's choice of law rules. *Mukamal v. Bakes*, 378 F. App'x 890, 896–97 (11th Cir. 2010) (citation omitted). Under Georgia law, breach of fiduciary duty claims fall within the internal affairs doctrine and are thus governed by the state of incorporation. *Rigby v. Flue-Cured Tobacco Coop.*

---

[2] Let's not forget that Defendants are clearly sophisticated and successful businessmen who are well-versed in the highly complex world that involves the virtually impenetrable, Byzantine mess that is the United States Department of Education's regulatory scheme. By claiming that the Complaint is an impermissible shotgun pleading, these experienced Defendants (and their very gifted counsel) are basically claiming that they can't even begin to figure out why they're being sued. This seemingly naïve position, however, is quickly undermined by their briefs that provide well-researched citations and legal reasoning detailing exactly how the Receiver's claims are so legally deficient that the Court shouldn't even give the Receiver the chance to make his case. It certainly strikes the Court as odd that Defendants were able to submit such detailed declarations to rebut the very claims they apparently couldn't figure out because the Receiver filed such a poor complaint. The Court easily finds that Defendants know what they're accused of and why they're being sued—and that is the real test for a shotgun pleading.

*Stabilization Corp.*, 794 S.E.2d 413, 416–17 (Ga. Ct. App. 2016); O.C.G.A. § 14–2–1505(c) ("This chapter does not authorize this state to regulate the organization or internal affairs of a foreign corporation authorized to transact business in this state."). Notably, the Receiver's Complaint—likely due in large part to the fact that ECA isn't a named defendant—is silent as to ECA's state of incorporation. *See generally* [Doc. 1]. Nevertheless, ECA's Notice of Removal from the Receivership Proceeding proves to be a quick fix for this inquiry. Therein, ECA admits that it "is a Delaware corporation." Notice of Removal, *VC Macon, GA LLC*, No. 5:18-cv-00388-TES, (M.D. Ga. Oct. 18, 2018), ECF No. 1, p. 3. Therefore, since Georgia law sends us to Delaware law and neither party contests that Delaware law applies, the Court will apply it in determining whether the Receiver's three claims survive.

Before getting started, the Court notes that "Delaware law recognizes that officers and directors are given wide latitude to run a corporation as they see fit for the benefit of shareholders." *Mukamal*, 378 F. App'x at 898 (citing *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979)). However, within this undeniably "broad and unyielding" latitude, "they are bound to act out of fidelity and honesty in their roles as fiduciaries." *Michelson*, 407 A.2d at 217; *Cede*, 634 A.2d at 361. "The duties of [loyalty] and [care] 'are the traditional hallmarks of a fiduciary who endeavors to act in the service of a corporation and its stockholders' and '[e]ach of these duties is of equal and independent

significance.'" *In re Pattern Energy Grp. Inc. Stockholders Litigation*, No. 2020-0357-MTZ, 2021 WL 1812674, at *47 (Del. Ch. May 6, 2021) (quoting *Cede*, 634 A.2d at 367).

  a.  Duty of Loyalty

  Of the fiduciary triad—loyalty, care, and good faith—shouldered by a corporation's officers and directors, the Receiver's first and third claims focus on the duty of loyalty. *Cede*, 634 A.2d at 361; [Doc. 1, ¶¶ 113–116, 123–26]. That fiduciary duty, however, is not limited to financial or other cognizable fiduciary conflicts of interest. *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006). Instead, "[i]t also encompasses [an officer or director's failure] to act in good faith. *Id.* (noting that "the obligation to act in good faith does not establish an independent fiduciary duty that stands on the same footing as the duties of [loyalty] and [care]"). Or, as the Receiver correctly couched it, "the duty of loyalty includes the duty of good faith." [Doc. 28, p. 14 (citing *Ritter*, 911 A.2d at 369–70)].

  "[T]he essence of the duty of loyalty is that corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests." *Mukamal*, 378 F. App'x at 898 (cleaned up). Put succinctly, "[t]he duty of loyalty requires a fiduciary to act in the best interests of the corporation." *Id.* (citing *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)). So, under Delaware law, the Receiver states a claim for breach of the duty of loyalty if he has alleged facts indicating that ECA or its minority shareholders were harmed or that a fiduciary personally

profited from a corporate opportunity. *Mukamal*, 378 F. App'x at 899–900 (citing *Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991)).

> *i.        Bad Faith (First Claim)*

For his first claim, the Receiver alleges that Defendants acted in bad faith by letting ECA incur massive amounts of closed-school loan discharge liability.

> ***A failure to act in good faith may be shown . . . where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation . . . or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.***

While these non-exhaustive examples of bad faith articulated in *In re Walt Disney Co. Derivative Litigation* were nothing new to Delaware jurisprudence, they echo decades of what bad-faith situations may include. 906 A.2d 27, 67 (Del. 2006). We certainly have allegations in the Receiver's Complaint that may be able to meet these examples.

Recalling certain portions of the Court's factual iteration of the Receiver's Complaint related to, *inter alia*, Defendants' failure to heed Swartzwelder's warning that closing ECA's schools with no teach-out plans exposed ECA to "enormous financial liabilities," this very well may be a case where ECA's officers and directors acted contrary to advancing its best interests. *See, e.g.*, [Doc. 1, ¶¶ 62–63]. The Court's concern at this stage is merely one of "plausibility," and the Receiver undoubtedly met his pleading burden. *McCullough*, 907 F.3d at 1333 (citing *Ashcroft*, 556 U.S. at 678–79).

ii. *Self-Dealing (Third Claim)*

Although the Receiver's third claim is still under the "Duty of Loyalty" umbrella, it focuses on a different ambit.

> **Traditionally, the term "self-dealing" describes the "situation when a [corporate fiduciary] is on both sides of a transaction . . . ."**

*Cinerama, Inc. v. Technicolor, Inc.* 663 A.2d 1156, 1169 (Del. 1995). On top of that premise, a classic example of self-dealing in the corporate law context involves an officer or director receiving a personal benefit from a transaction that is not received by the shareholders generally. *Cede*, 634 A.2d at 362. That general premise is the gist of the Receiver's self-dealing claim: Defendants took actions to ensure Willis Stein's reimbursement on its $20-million investment instead of helping ECA fulfill its regulatory obligations. [Doc. 1, ¶¶ 45, 73, 77].

Defendants, though, contend that such a premise for a claim is "faulty." [Doc. 19, p. 18]. According to them, the Backstop Agreement made ECA nothing more than "a donee beneficiary with unvested rights" giving Willis Stein the freedom "to modify, rescind, or revoke" its financial support. [*Id.* at pp. 18–19], [Doc. 1, ¶¶ 45, 73]. Long story short, Defendants are of the position that ECA never had the ability to force Willis Stein's support for its regulatory obligations. On the flip side, the Receiver, of course, alleges that Defendants knew that ECA's closure would pose a "significant problem for Willis Stein because it would wipe out Willis Stein's equity investment and trigger" Willis Stein's $20-million obligation for regulatory support. [Doc. 28, p. 16]. But, such an

20

argument, at this juncture, distracts from the big picture—the general premise discussed above—of the Receiver's self-dealing claim. To put it bluntly, the innerworkings of the Backstop Agreement and what it does or doesn't do isn't the Court's concern at this point. Again, the Court is merely focused on "plausibility" of a claim. *See McCullough*, *supra*. Factually well-pled claims, generally speaking, when viewed through a 12(b)(6)-lens are like hand grenades and horseshoes: you don't have to make the perfect shot, you just have to be close enough.

Right now, the plausibility of this claim doesn't rest on what the Backstop Agreement might have or might not have required of Willis Stein because of the later-reached agreements. Rather, the Receiver's self-dealing claim rests on the significance of who executed those agreements to the Backstop Agreement. When Stein executed them, he did so on Willis Stein's behalf. [Doc. 1, ¶ 76]. That's all well and good. But let's not forget the Receiver's basic, factual allegation that Stein was also ECA's Chairman and directly ordered ECA's general counsel to sign the agreements. [*Id.* at ¶¶ 3, 76]. Stein, as ECA's Chairman and as a co-founder and a partner of Willis Stein, has clearly "appear[ed] on both sides of a transaction." *Cede*, 634 A.2d at 362. And, given that Stein himself owned approximately three percent of Willis Stein's investment in ECA, he could have been making decisions during the implosion of ECA to give himself a much softer landing or to make sure his personal financial losses were minimized—both textbook examples of "personal benefit[s]." *Id.*; [Doc. 1, ¶¶ 3, 72]. It will be up to

Defendants to satisfy their burden of establishing the "entire fairness" of these agreements, and defeating the Receiver's self-dealing claim will require Defendants' demonstration of their "utmost good faith and the most scrupulous inherent fairness of the bargain[.]" *Nixon v. Blackwell*, 626 A.2d 1366, 1376 (Del. 1993) (quoting *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983)). Right now, though, it's too early to tell, and the Receiver's allegations viewed through the 12(b)(6)-lens are close enough to plausibly state a self-dealing claim.

Defendants' Motion to Dismiss the Receiver's first and third claims for breaches of the duty of loyalty is **DENIED**.

> b.      Duty of Care (Second Claim)

The Receiver's second claim is one for breach of the fiduciary duty of care, a duty that Delaware law elevates to the same pedestal as the duty of loyalty. *See Ritter*, 911 A.2d at 370; *In re Pattern Energy Grp.*, 2021 WL 1812674, at *46; [Doc. 1, ¶¶ 117–22]. Although Delaware law considers the duties of loyalty and care to be equal, there is some daylight between the two fiduciary duties with respect to what must be alleged to state a claim. Notwithstanding this sliver of daylight, the Receiver relies on the same factual allegations used to support his breach of duty of loyalty claim as well as his duty of care claim. [Doc. 28, p. 17]. To briefly reiterate, the Receiver relies on his allegation that Defendants' failure to have teach-out plans in place caused ECA to incur enormous financial liability. *See, e.g.*, [Doc. 1, ¶¶ 62–63].

A breach of the duty of care exists if Defendants acted with gross negligence. *Morrison v. Berry*, No. 12808-VCG, 2019 WL 7369431, at *22 (Del. Ch. Dec. 31, 2019) (citation omitted). In order to adequately plead gross negligence, the Receiver must allege "conduct that constitutes more than deliberate indifference or actions that are without the bounds of reason." *Id.* More than simple carelessness must be pled. *Id.*

According to the Receiver, warning after warning stressing the absolute necessity of teach-out plans fell on deaf ears. [Doc. 1, ¶¶ 7, 60, 66]. The Receiver's Complaint clearly alleges that Defendants' failure to heed those warnings could have been (were) what paved the way for ECA to acquire massive sums of DOE-discharged loan liability and other gigantic debts. [*Id.* at ¶ 112]. That said though, it must be remembered that a determination of whether Defendants' decision to snub those warnings was an informed one will turn on whether they "have informed themselves 'prior to making [that] decision, of all material information reasonably available to them." *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985) *overruled on other grounds by Gantler v. Stephens*, 965 A.2d 695, 713 n.54 (Del. 2009).

With the allegations in the Receiver's Complaint taken as true and when looking at the story his Complaint tells, it is plausible that Defendants' actions, or lack thereof, were "made without the bounds of reason." *Morrison*, 2019 WL 7369431, at *22. Again, the Receiver's Complaint alleges enough facts "to raise a reasonable expectation that discovery will reveal evidence" supporting a claim. *Twombly*, 550 U.S. at 556. That's all

the law requires of him at this point. Whether Defendants' decisions to ignore the teach-out related warnings will be shielded by the business judgment rule may very well be something that a jury has to answer. But, based on the Receiver's allegations, his second claim for breach of the duty of care lives to see another day, and Defendants' Motion to Dismiss that claim on the argument that the Receiver has failed to rebut the presumption of the business judgment rule, *see* Discussion, Section (B)(5), *infra*, is **DENIED**. [Doc. 19, p. 30].

### 3. Defendants Argue that the Receiver Fails to State a Claim Based on His Own Conduct

Boldly enough, Defendants argue that the Receiver's claims should be dismissed because "the Receiver, not Defendants, had sole authority over [ECA's actions]." [Doc. 19, p. 22]. This argument significantly misses the mark. Yes, it may have been "the Receiver" who "decided there was no other choice but for ECA to announce that it would cease operations and wind down[,]" but Defendants seem to forget that the Receiver is suing for actions taken and decisions made well *before* his involvement. [*Id.* at p. 23 (quoting [Doc. 1, at ¶ 110])]. He's not suing Defendants because he made the decision to ultimately close ECA, he's suing them for the decisions they made during its final months of operation that put him in that position.[3]

---

[3] To put it another way, Defendants argue that because the Receiver was in the co-pilot's seat when the plane crashed, it's all his fault. Of course, such a novel theory would require the Court to ignore the Receiver's allegations that they locked the plane on an auto-piloted death course and grabbed the only parachutes available to ensure their safe, soft landing.

The Court appointed the Receiver on November 14, 2018. [Doc. 1, ¶ 13]. A month before that—before the Receiver even knew anything about ECA's dire situation—Defendants received warnings about the consequences of closing without teach-out plans. [*Id.* at ¶¶ 62–63]. But, no one heeded those warnings to institute teach-out plans, and ECA closed. Assuming, *arguendo,* that the Receiver should've taken the development of teach-out plans under his wing, there's still the issue with the settlement and the amendment to the Backstop Agreement. The factual allegations surrounding how Defendants approached negotiating the settlement agreement and the Backstop Agreement's amendment certainly didn't involve the Receiver. The Receiver's actions since his appointment will not act as a bar to his claims for Defendants' actions before his appointment. Defendants' Motion to Dismiss the Receiver's claims based on this reason is **DENIED**.

### 4.    Defendants Argue that the Receiver is Judicially Estopped from Asserting Claims Relating to ECA's Loans

While Delaware law governs the Receiver's claims for breaches of fiduciary duties, Defendants' judicial estoppel defense turns on law as developed in the Eleventh Circuit. Sounding in equity, judicial estoppel "is intended to 'prevent the perversion of the judicial process' and 'protect [its] integrity . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001)). "Stated simply, the doctrine of judicial estoppel rests

on the principle that 'absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.'" *Slater*, 871 F.3d at 1180–81 (citation omitted).

The Eleventh Circuit employs a two-part test. First, courts look to whether the party took an inconsistent position under oath in a separate proceeding and then to whether the "inconsistent positions were 'calculated to make a mockery of the judicial system.'" *Id.* at 1181. Both positions, as well as the party's motive in changing positions, must be considered. *Id.* "Judicial estoppel should not be applied when the inconsistent positions were the result of "inadvertence[ ] or mistake" because judicial estoppel 'looks towards cold manipulation and not an unthinking or confused blunder.'" *Id.* (quoting *Johnson Serv. Co. v. Transamerica Ins. Co.*, 485 F.2d 164, 175 (5th Cir. 1973)).

However, in *Maine v. New Hampshire,* the United States Supreme Court laid out three, non-exhaustive factors for determining whether to apply judicial estoppel. First, "a party's later position must be clearly inconsistent with its earlier position." *Slater*, 871 F.3d at 1181 (quoting *New Hampshire*, 532 U.S. at 750–51). Second, "the party had to 'succeed[ ] in persuading a court to accept that party's earlier position, so that judicial acceptance of' the party's later position 'would create the perception that either the first or the second court was misled[.]'" *Id.* And third, "the party 'seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'" *Id.* However, because Defendants—the party

seeking to invoke the doctrine—are not parties in the Receivership Proceeding, *New Hampshire*'s factors don't apply to this case. *Id.* at 1182.

So, the main inquiry is whether the Receiver is now trying "to make a mockery of the judicial system." *Id.* at 1181. Defendants contend that in the Receivership Proceeding, the Receiver took the position that the credit agreements ECA negotiated with Willis Stein and Monroe were "commercially reasonable and in the best interest of the Receivership Estate." [Doc. 19, p. 26]. Truth be told, the best way to uncover the Receiver's about-face position of why the credit agreements were previously coined "commercially reasonable" but are now characterized as being in Defendants' and Willis Stein's best interest is to simply depose him. Without any explanation for the about-face, the Court cannot say that the Receiver's inconsistent positions are "intended to make a mockery of the judicial system." *Slater*, 871 F.3d at 1181. For this reason, Defendants' Motion to Dismiss based on the doctrine of judicial estoppel is **DENIED**.

### 5. Defendants Argue that the Receiver's Claims are Barred by the Business Judgment Rule

Based on how Defendants interpret the Receiver's claims, they cast them as non-cognizable claims for deepening insolvency and as ultimately seeking recovery for ECA's creditors. *See, e.g.*, [Doc. 19, pp. 16–18, 27]. Defendants' position on Delaware's stance on stand-alone claims for deepening insolvency isn't incorrect.

"Delaware law imposes no absolute obligation on the board of a company that is unable to pay its bills to cease operations and to liquidate." *Trenwick Am. Litig. Tr. v.*

*Ernst & Young, L.L.P.*, 906 A.2d 168, 204 (Del. Ch. 2006). In fact, "[e]ven when the

company is insolvent, the board may pursue, in good faith, strategies to maximize the

value of the [company]." *Id.*

> *If the board of an insolvent corporation, acting with due diligence and good faith, pursues a business strategy that it believes will increase the corporation's value, but that also involves the incurrence of additional debt, it does not become a guarantor of that strategy's success. That the strategy results in continued insolvency and an even more insolvent entity does not in itself give rise to a cause of action. Rather, in such a scenario the directors are protected by the business judgment rule. To conclude otherwise would fundamentally transform Delaware law.*

*Id.* at 205. Bottom line, if the Receiver can't state a claim that Defendants acted disloyally

or without due care in implementing ECA's restructuring plan, he can't hang his hat on

the fact that an already red ECA got redder. *See id.* However, "[t]he rejection of an

independent cause of action for deepening insolvency" doesn't wipe the fiduciary slate

clean for Defendants. *Id.* If it did, what recourse would there be assert claims for

fiduciary breaches? Because Delaware law certainly allows those.

Defendants argue that the Receiver's claims rest on nothing more than fiduciary

breach-based claims cloaked in "deepening insolvency" clothing. [Doc. 19, p. 16].

Although independent claims for deepening insolvency are a no-go, Delaware law

indisputably allows fiduciary breach-based claims even where the supporting

allegations for those claims paint a "deepening insolvency" picture. In the end, it all

comes down to one thing—business judgment. *See Trenwick*, 906 A.2d at 205.

If officers and directors exercise their business judgment in consideration of the company's business optics, "then the appropriate tool to examine [their] conduct . . . is the traditional fiduciary duty ruler." *Id.* "Existing equitable causes of action for breach of fiduciary duty . . . are the appropriate means by which to challenge the actions of boards of insolvent corporations." *Id.* at 174. Hence the Receiver's choice to specifically label his claims as breaches of the fiduciary duties of loyalty and care.

So, how would the defense of the business judgment rule work in this case to bar the Receiver's claims? With two functions, the rule operates as a guide for litigants and as a rule of evidence that places the burden of proof on the Receiver. *Cinerama*, 663 A.2d at 1162. Much easier to comprehend than it is to overcome, the business judgment rule "posits a powerful presumption in favor of actions taken by . . . a loyal and informed board." *Cede*, 634 A.2d at 361.

By the declarations they attached to their Motion to Dismiss, Defendants contend that they have demonstrated "both a rational business justification for the restructuring plan[]" and that their decision to close ECA without teach-out plans in place was not made without appreciating the implications. [Doc. 34, p. 20]. Truthfully, the Court did not even consider Defendants' declarations in making its ruling. They haven't even filed an answer to the Receiver's Complaint yet, so their defenses are—for the most part— vastly unknown. Taking the Receiver's allegations in his Complaint as true, this is unquestionably a multi-million dollar lawsuit, and the Court's not going to shut it

down based on pre-answer declarations for such fact-intensive inquiries when the
Receiver hasn't even had the opportunity to combat their contents. Defendants' attempt
to have the Court essentially make a summary adjudication on a one-sided record
simply isn't appropriate. What's more, neither side even began to venture into the
burden-shifting analysis of the business judgement rule or Delaware law's three tiers of
review for evaluating officer and director decision-making. *Cede*, 634 A.2d at 361; *In re
Pattern Energy Grp.*, 2021 WL 1812674, at *30–46. Too many questions remain in this
case, and they are questions that can only be answered with the benefit of a fully-
developed factual record. Thus, Defendants' Motion to Dismiss the Receiver's claims on
the basis that his allegations are wholly insufficient to rebut the presumption of the
business judgment rule is **DENIED**. [Doc. 19, p. 30].

### 6.   Defendants Argue that the Receiver Lacks Standing to Sue ECA's Creditors

The Receiver's Complaint asserts claims based on harm to ECA. Circling back to
the beginning of this opinion, the Receiver has the authority "[t]o assert any rights,
claims, or choses in action of ECA . . . ." [Doc. 1, ¶ 26]. Not to limit the Receiver's factual
allegations but to state them as generally as possible, the harm caused by Defendants'
failure to implement teach-out plans and their negotiation tactics related to the
amendment to the Backstop Agreement are things that ECA could have brought against
the Defendants. The Receiver, now, has just stepped into ECA's shoes to assert its
claims for breaches of fiduciary duties. Thus, Defendants' standing argument cannot

serve as a dismissal avenue, and their Motion to Dismiss the Receiver's Complaint based on that argument is also **DENIED**.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court **DENIES** Defendants' Motion to Dismiss [Doc. 19] and **TERMINATES as moot** their Motion to Stay Discovery [Doc. 27].

**SO ORDERED**, this 1st day of October, 2021.

<u>S/ Tilman E. Self, III</u>
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**